Filed 7/25/13  In re Jaylon D. CA4/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re JAYLON D. et al., Persons Coming Under the Juvenile Court Law. | D063640 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. SJ12843A-B) |
| v. | |
| JASON D., | |
| Defendant and Appellant. | |

APPEAL from judgments of the Superior Court of San Diego County, Garry G. Haehnle, Judge.  Affirmed.

Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Patrice Plattner-Grainger and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

Jason D., father of Jaylon D. and Victoria D. (the children), appeals the disposition orders[1] declaring the children dependents of the court and removing them from his custody. Jason contends there was insufficient evidence to support the removal orders and the court's jurisdictional findings that the children are persons described in Welfare and Institutions Code section 300, subdivisions (a) and (j).[2] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In December 2012, the San Diego County Health and Human Services Agency (the Agency) filed petitions on behalf 12-year-old Jaylon and eight-year-old Victoria under section 300, subdivision (a), alleging the children had suffered, or there was a substantial risk they would suffer, serious physical harm inflicted by Jason nonaccidentally. The petition filed on behalf of Jaylon alleged that Jason held and twisted Jaylon's right wrist, causing Jaylon to fall to the ground in pain. The petition filed on behalf of Victoria alleged that Jason slapped Victoria on the face and, in a separate incident, burned her arm with a curling iron. Both petitions included an allegation that the children's mother, Blanca D., had failed to adequately protect the child, and an allegation under section 300,

---

[1]     In a dependency case, the disposition order is the first appealable order and constitutes the judgment in the case. (*In re S.B.* (2009) 46 Cal.4th 529, 532; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1250.)

[2]     All further statutory references are to the Welfare and Institutions Code.

2

subdivision (j), that the child was at a substantial risk of abuse or neglect because of Jason's abuse of the child's sibling. The court ordered both children detained with Blanca.

At the time of the alleged incidents, Jason and Blanca were separated after a 12-year marriage and were going through marriage dissolution proceedings, which included contentious custody issues. The children resided with Blanca and had visitation with Jason on Tuesdays, Wednesdays, and Thursdays from 4:00 p.m. to 7:00 p.m. and every other weekend.

The Agency's detention report stated that on October 24, 2012, the Agency received a referral alleging Jason had physically abused Victoria while she was riding in the front seat of Jason's car and Jaylon was in the backseat. Jason reportedly became angry with Victoria for disobeying and disrespecting him and hit her on the mouth and side of her leg. Victoria told the social worker that Jason became upset and yelled at her when he learned that she had taken Jaylon's hat to school without permission. He slapped her and she began to cry because it hurt. Jason asked her, "Why are you crying?"

Victoria told the social worker Jason usually disciplined her and Jaylon by yelling or hitting them, and they never knew how he was going to react when he became angry. She said she was scared of Jason at times because she did not want him to get mad and hurt them. She wished he would "change" his temper and not be so mean. When asked about drug or alcohol use at the home, Victoria said Jason drank a lot of Bud Light and carried a cooler with beer in it when they went places. She said, "He always puts beer inside a soda cup, like if it is soda. He sometimes carries it in the car and takes sips while

3

he is driving."  Jaylon also told the social worker that Jason drank beer and put it in a "fountain drink cup" while driving in case he got pulled over by the police.

On November 7, 2012, the Agency received a second referral alleging that during an argument with Jaylon over his grades, Jason twisted Jaylon's wrist and pushed him to the ground.  Blanca had arrived home with the children after picking them up from school and saw that Jason was parked in their parking lot.  Jaylon went over to Jason to talk about his grades and Blanca and Victoria went inside their apartment.  Blanca started making dinner when she heard Jaylon scream.  She went outside and saw Jaylon sitting on the grass in front of their doorway, holding his wrist and crying.  She immediately called the police to document the incident.  Jaylon told the social worker that Jason was upset because he was getting a "C" in his math class.  Jason told Jaylon that he would move him to a different school if he did not improve his grades.  Jaylon became upset and said, "You can't move me from my school unless my mom agrees."  Jason then grabbed and twisted Jaylon's wrist and pushed him to the ground.  As he walked away he said, "Yeah, I do whatever I want with you so you better get those grades up!"

The previous March, Jason returned the children from a scheduled three-hour visit one hour after he picked them up.  The children told Blanca they no longer wanted to go with Jason, and Jaylon reported that Jason had spit on his head.  In April, Victoria expressed concern that Jason's temper had been getting worse, and that Jason had been hitting and spitting on Jaylon.

On November 27, 2012, an Agency social worker met with the family and saw that Victoria had a severe burn on her left arm.  Victoria told the social worker Jason had

4

burned her arm with a hot curling iron to prove to her the iron was still hot. The incident occurred while Jason and the children were visiting Jason's parents in Wyoming during their Thanksgiving vacation. Victoria said Jason unplugged the iron and she was about to place it on a counter. Jason told her not to because it was still hot. She responded that the iron cools down once it is unplugged. Jason quickly tapped the iron with his finger and asked if she still thought it had cooled down. When she replied that it was not hot, Jason placed the iron on her arm and said, "See, it is hot." Victoria began to cry because it hurt and Jason said, "Why are you crying? I barely tapped you." When she showed him the burn on her arm the next day, he apologized and put cream on it.

When the social worker first contacted Jason by phone to schedule an appointment to meet him in person, Jason yelled at her and used foul language. However, when the social worker met with him six days later he apologized for his behavior on the phone. He denied that he was physically abusive toward the children. He told the social worker he never intended to burn Victoria and, in his opinion, she was not hurt. He explained he did not want her to place the curling iron on a stack of papers and was trying to prove to her the iron was still hot when he tapped it and told her it was hot. Victoria gave him a "sassy, smart aleck look," so he tapped her on the arm with the iron. He told the social worker that he did not notice any mark or burn on her arm until the next day and that Victoria did not complain of any pain.

Regarding the allegation that he slapped Victoria on the face in his car, Jason said he only "tapped" her cheek because she acted "sassy" and made a "screw you" face at him while he was scolding her for taking Jaylon's hat to school after being told not to. He

5

admitted that Victoria began to cry, but said she cried all the time because she was a "drama queen."

Jason denied twisting Jaylon's wrist. He said he was talking to Jaylon about improving his grades and Jaylon said, "Yeah, whatever." Jaylon's response upset him so he grabbed Jaylon's hand and "squeezed it" firmly. Jaylon began to scream and "went limp" and fell to the ground.

In the jurisdiction/disposition report, the social worker reported that she had asked the children to draw or write things that fell within each of the following three categories: House of Worries, House of Good Things, and House of Dreams. Jaylon's list House of Worries included, "Getting late to the visitations. My dad gets mad if [we're] late. He could wait a little longer." Under "House of Good Things" Jaylon wrote, "Going a little bit less times with my dad. To go lik[e] visits before. Wednesdays. And every other weekend only." Jaylon's House of Dreams included, "No stress – Meaning there is no pressure from my dad about mostly everything for example not as much visitations[.]" Under "House of Worries" Victoria wrote: "My dad will get mad and he will yell or hit me and my brother[,]" and "I will live with someone else and I won't see my dad and my mom[.]" Victoria's House of Dreams included, "My dad will not be that rough with me and my brother[.]"

Jason told the social worker he disagreed with the allegations of the petitions. He admitted making "dumb mistakes not intended to injure" the children, but denied hurting them. He stated his relationship with the children "was being strained and ruined because of [Blanca,]" and that Blanca "keeps screwing around with [the children's] well[-]being"

6

and was "trying to ruin [him]." He described Blanca as a "hateful person" who "[f]akes it in front of people." He expressed that he was frustrated with the social worker and stated: "The allegations are BS. I will do anything, I just want them back. I know who I am and I am a damn good dad. I am just a normal human being that just wants his kids."

Blanca told the social worker: "Jason needs to become mature. Recognize he has a problem. His behavior has consequences. He needs help to control and recognize his behavior and temper and his problem with alcohol. If he really loves the children the way he says he does he needs to do what is asked of him. He has characteristics of being a good dad, but his behavior doesn't allow him to[]."

An addendum to the jurisdiction/disposition report, filed on the day of the jurisdiction/disposition hearing, addressed Jason's visitation with the children. After Jason's initial visit at New Alternatives – Family Visitation Center,[3] a staff member expressed concern that Jason was a bit intimidating and "borderline inappropriate," and was not receptive to being redirected during the visit. The New Alternatives staff was concerned that Jason would "go off on us" if redirected during future visits. The staff member who monitored the visit reported that Jason was controlling and passive aggressive with the children during the visit.

The social worker reported that when she discussed the visitation supervisors' concerns with Jason, Jason "appeared to be more concerned with the system's involvement than the actions that brought the family to the Agency's attention. [Jason]

---

[3] The Agency supervised four visits before the initial visit at New Alternatives.

went off topic and made statements to the [social worker] about why there is not more information about how the mother has done wrong and why is the report about what he has done wrong." The Agency recommended that Jason "continue to have supervised visitation with the children for the following reasons: incidents of inflicted physical harm toward[] the children by the father, the father's demeanor during the Agency's involvement, the father's behavior during supervised visitation, children's statements, and the children's three houses illustrations . . . ."

At the jurisdiction/disposition hearing, the court admitted the Agency's detention report, jurisdiction/disposition report, and two addendum reports into evidence. Jason testified at the hearing about the three incidents alleged in the Agency's petitions and gave essentially the same version of each incident that he had previously given to the social worker. Regarding the incident in which he allegedly twisted Jaylon's wrist, Jason admitted that squeezing Jaylon's hand was not the best course of action and noted that he should have "just walked him to the front door, gave him a hug and kiss and say I will see you tomorrow." Regarding the incident in which he allegedly slapped Victoria, he testified that "tapping" Victoria on the cheek and admonishing her to show respect and not get sassy was not the best way to handle that situation. Instead, he should have parked the car and then talked more to Victoria about the incident because "the conversation that was being done up to that point was all on the highway. And you can't really have a conversation driving on the highway."

Jason testified that the curling iron incident that resulted in his burning Victoria was "the biggest mistake of my life." He could have handled that situation better by

8

talking to Victoria instead of trying "to use an example[.]" He added, "I should have just put the curling iron down and told her it was hot. Don't touch it until it cools down and just left it alone and gone on with our day."

On cross-examination, Jason testified that he did not think he had a problem with his temper or handling his anger with people other than his children. He said he was learning "better ways to teach kids things," and admitted that he needed to learn patience and to be able to listen to his children.

The court sustained the petitions and found the allegations under section 300, subdivisions (a) and (j), true by clear and convincing evidence.[4] The court ordered the children removed from Jason's custody and placed with Blanca. The court directed the Agency to provide services to both parents and ordered the parents to comply with those services. The court authorized telephonic visitation between Jason and the children for at least one hour twice a week, and authorized Jason to attend the children's extracurricular activities as long as there was no one-on-one contact between him and the children. The court gave the social worker the discretion to lift the supervision of Jason's visitation with the children and allow overnight and weekend visits with notice to children's counsel. The court also gave the social worker discretion to allow a 60-day trial visit with the concurrence of children's counsel.

---

4    In sustaining the petitions, the court found true the allegations that Blanca had failed to adequately protect the children. Blanca does not contest those findings.

DISCUSSION

I. *Jurisdictional Findings*

Jason contends the court's jurisdictional findings are not supported by substantial evidence. He argues that because he has acknowledged that the manner in which he disciplined the children in the three incidents alleged in the petitions was inappropriate and he is committed to changing his behavior, there has been no showing the children continue to be at risk.

"At the jurisdictional hearing, the court determines whether the minor falls within any of the categories specified in section 300. [Citation.] ' "The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child . . . comes under the juvenile court's jurisdiction." ' [Citation.] On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings." (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.)

Evidence is " '[s]ubstantial' " if it is " 'reasonable, credible, and of solid value.' " (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.) It is the trial court's role to assess the credibility of witnesses and resolve the conflicts in the evidence. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52.) "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in

support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion. [Citation.] The appellant has the burden of showing the finding or order is not supported by substantial evidence." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdictional hearing. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396.) A parent's " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.) " 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Jurisdiction is proper based on the neglect and abuse of one parent, even if the other parent is capable of providing appropriate care. (*In re Jeffrey P.* (1990) 218 Cal.App.3d 1548, 1553-1554.)

We conclude substantial evidence supports the court's jurisdictional findings under section 300, subdivision (a), that the children were at substantial risk of suffering serious physical harm. The evidence showed that Jason had a history of losing his patience and temper with the children when he thought they were behaving disrespectfully toward him or not meeting his expectations. There was evidence that before the three incidents alleged in the Agency's petitions, Jason had been hitting and spitting on Jaylon, and Victoria had expressed concern that Jason's temper was getting worse. In April 2012, Victoria said she believed Jason was "really stressed out" and that is why he had been

hitting Jaylon.  There was also evidence that Jason became angry and yelled at the children and yelled at Blanca and insulted her in front of the children.  Both children reported that Jason drank a lot of beer and would sometimes drink it from a soda cup when he was driving to hide the fact that he was consuming alcohol.

During the course of the dependency proceedings, Jason displayed inappropriate behavior during visitation with the children.  He became angry at a visit in December 2012 when the social worker informed him that the court had approved the children to travel to Mexico with Blanca to visit her family.  He complained about the court's order in an aggressive tone and the social worker told him to calm down.  The staff at New Alternatives reported Jason's behavior was "borderline inappropriate" and they were concerned he would "go off" if redirected during visits.  Jason was verbally aggressive and sarcastic over the phone with the staff member who contacted him to schedule his first visit at New Alternatives.  During that visit, which occurred two weeks before the jurisdiction/disposition hearing, Jason reportedly engaged in controlling and passive-aggressive behavior toward the children.  He frequently interrupted the children when they were speaking and repeatedly asked them questions without letting them answer.

The three incidents alleged in the petitions occurred in a relatively short period of time (between October 9 and November 24, 2012) and it was a relatively short period of time from the date the Agency filed the petitions (December 5, 2012) to the jurisdiction/disposition hearing on January 29, 2013.  The court was entitled to accept the children's version of the those incidents and conclude that although Jason had good intentions, the children were still at risk.  Specifically, the court was entitled to accept

12

Victoria's statements that Jason slapped her on the face and Jaylon's statements that Jason forced him to the ground by painfully twisting his wrist, and reject Jason's statements that he merely "tapped" Victoria on the cheek and squeezed Jaylon's hand and that Jaylon voluntarily went limp and went to the ground.

In the jurisdiction/disposition report, the social worker concluded that Jason had failed to accept full responsibility for his behavior and the injuries he caused to the children, and that he lacked the ability to recognize and control his temper, which had led to his unnecessary use of physical discipline. The social worker noted that Jason repeatedly attributed the Agency's involvement with the family to Blanca's desire to "ruin" him. The social worker opined that Jason's behavior showed "a significant lack of concern for the children's safety and the lack of education and knowledge about proper child discipline." The court was entitled to find the social worker's opinion credible, and to give great weight to her assessment. (*In re Casey D., supra,* 70 Cal.App.4th at p. 53.)

Section 300, subdivision (a), expressly authorizes the court to base a finding of a substantial risk of serious future injury "on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent . . . which indicate the child is at risk of serious physical harm." Based on the evidence discussed above, the court could reasonably conclude that although Jason's testimony at the jurisdiction/disposition hearing indicated he was beginning to take responsibility for his actions and acknowledge he had engaged in inappropriate conduct toward the children, at the time of the hearing,

13

there was still a substantial risk he would inflict serious physical harm nonaccidentally upon the children.

Jason relies on *In re J.N.* (2010) 181 Cal.App.4th 1010 (*J.N.*) in arguing that the incidents alleged in the Agency's petitions did not reach the level necessary for the court to take jurisdiction under section 300, subdivisions (a) and (j). However, the issue in *J.N.* was "whether evidence of a single episode of parental conduct was sufficient to bring . . . children within the juvenile court's jurisdiction." (*J.N., supra,* 181 Cal.App.4th at p. 1022.) Here, there was not only evidence of the three distinct episodes of parental conduct alleged in the petitions, but also evidence that Jason had a history of other inappropriate conduct directed at the children, such as spitting and hitting, and an escalating problem with controlling his anger and inappropriately disciplining the children. The evidence sufficiently supports the court's jurisdictional findings under section 300, subdivision (a).

Regarding the allegations of the petitions under section 300, subdivision (j), we note that " '[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' " (*In re I.J., supra,* 56 Cal.4th at p. 773.)

14

Although it is unnecessary to address the court's findings under section 300, subdivision (j), we conclude that the evidence supporting the court's findings under section 300, subdivision (a), as to both Jaylon and Victoria, also supports the court's findings under subdivision (j). Section 300, subdivision (j), provides that a child is within the jurisdiction of the juvenile court if "[t]he child's sibling has been abused or neglected, as defined in subdivision (a) [serious physical harm inflicted nonaccidentally] . . . , and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." The evidence presented at the jurisdiction/disposition hearing sufficiently supports the court's findings under section 300, subdivision (j), because it shows a pattern of anger-driven excessive discipline directed toward *both* children that puts them equally at risk of serious physical harm inflicted by Jason nonaccidentally.

## I. *Dispositional Findings*

To remove the children from Jason's parental custody, the Agency was required to prove by clear and convincing evidence that "[t]here is or would be a substantial danger to [their] physical health, safety, protection, or physical or emotional well-being [if they] were returned home" and removal was the only reasonable means of protecting their physical health (§ 361, subd. (c)(1)). "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus . . . is on averting harm to the child." (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136.) The court is entitled to consider the parents' past conduct and current situation and gauge

15

whether they have progressed sufficiently to eliminate any risk. (*In re S.O., supra,* 103 Cal.App.4th at p. 461; cf. *In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1221.)

On appeal, Jason has the burden of showing there is no substantial evidence justifying removal. (*In re Diamond H., supra,* 82 Cal.App.4th at p. 1135; *In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.) " ' "The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine . . . ." [Citations.]' [Citation.] Thus, on appeal from a judgment required to be based upon clear and convincing evidence, 'the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.' " (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880-881, quoted in *In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581.) "We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

As noted, the court found the allegations of the petitions true by clear and convincing evidence, even though the standard of proof for jurisdictional findings is preponderance of the evidence. Based on the evidence of Jason's past incidents of inappropriately disciplining the children, the aggressive behavior and attitude he displayed during supervised visitation shortly before the disposition hearing, and the social worker's assessment that he had not accepted full responsibility for the injuries he had caused to the children and was unable to recognize and control his temper, the court could reasonably find removal was appropriate to avert future harm to the children.

16

Although the record shows that Jason has fully participated in services and visitation and is committed to doing whatever it takes to regain his shared custody of the children, there is sufficient evidence to support the court's determination that as of the time of the jurisdiction/disposition hearing, Jason had not sufficiently progressed to eliminate any risk of harm to the children and the necessity of removal.

## DISPOSITION

The judgments are affirmed.


HALLER, J.

WE CONCUR:


NARES, Acting P. J.


AARON, J.